**IN THE FRANKLIN COUNTY, OHIO COURT OF COMMON PLEAS**

| | | |
|---|---|---|
| **T & R Properties, Inc.**<br>3895 Stoneridge Lane<br>Dublin, Ohio 43017<br>Plaintiff,<br>vs. | : | JURY DEMAND ENDORSED HEREON |
| **Arthur J. Gallagher**<br>**Risk Management Services, Inc.**<br>201 East Fourth Street, Suite 625<br>Cincinnati, Ohio 45202<br>Defendant. | : | Case No. ________________<br>Judge ___________________ |

**COMPLAINT**

Now comes Plaintiff and state as for its Complaint against Defendant as follows:

**PARTIES**

1. Plaintiff T & R Properties, Inc. ("T & R") is a corporation formed pursuant to the laws of the state of Ohio.

2. T & R's principal place of business is located in Franklin County, Ohio.

3. Defendant Arthur J. Gallagher Risk Management Services, Inc. is, upon information and belief, an Illinois domestic insurance company legally authorized to do business in the state of Ohio.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction because:

(a) Plaintiff has its principal place of business in Franklin County, Ohio;

(b) Defendant's breaches of duty due Plaintiff (a Franklin County resident) in Franklin County, Ohio constitutes a breach of duty in Franklin County, Ohio; and

(c) The representations of Defendant upon which Plaintiff relied were made in Franklin County, Ohio;

(d) The parties' contract was entered into in Franklin County, Ohio;

(e) Defendant's branch office is in Ohio.

5. Venue is proper in this Court under Ohio Civ.R.3(C)(3),(6) because:

(a) The duties owed to Plaintiff, a Franklin County, Ohio resident, were to be performed in Franklin County, Ohio.

(b) The parties' contract was to be performed in Franklin County, Ohio;

(c) Defendant's breaches of contract occurred in Franklin County, Ohio.

(d) Defendant 's promise orally estopped from denying venue in Franklin County, Ohio.

(e) The services performed by Defendant for Plaintiff took place in Franklin County, Ohio.

## FACTS

6. In January of 2016, Plaintiff contracted with Defendant to provide business insurance advice and expertise and to procure business insurance on Plaintiff's behalf.

7. Plaintiff relied upon Defendant, as its trusted insurance agent, to assess Plaintiff's insurance needs, advise Plaintiff on available coverages, accurately and fully explain to Plaintiff available coverages, and to secure for Plaintiff the best available coverage to protect Plaintiff and its properties.

8. Defendant knew or should have known that Plaintiff placed special trust, confidence, and reliance in and was influenced by Defendant, who had a fiduciary duty to act for the benefit of Plaintiff.

***Defendant misrepresents the renewal rate increase, revealing the actual increase of over 30% only days before Plaintiff's insurance policies are set to lapse.***

9. On or about February 25, 2019, Plaintiff reached out to Defendant regarding the renewal of its insurance policies that were set to lapse May 31, 2019 and requested a pre-renewal meeting to review insurance renewal proposals.

10. After Plaintiff requested said meeting, Plaintiff received a Notice of Nonrenewal from one of its carriers.

11. When Plaintiff informed Defendant of the aforementioned Notice, Defendant told Plaintiff to ignore the Notice because it had been sent due to Defendant's provision of inaccurate information to that carrier.

12. On or about March 7, 2019, Plaintiff and Defendant met to go over projections for renewal of the insurance policies provided to Plaintiff by Defendant, but Defendant did not provide any actual proposals.

13. During the aforementioned meeting, Defendant informed Plaintiff that there was a projected increase of 5-8% on the premiums of the polices held by Plaintiff.

14. About a month later, on or about April 19, 2019, Plaintiff once again voiced its request for a pre-renewal meeting and requested that Defendant confirm that the premium increase would only be 5-8%.

15. Defendant, on or about April 20, 2019, confirmed with and Promised Plaintiff that the premium increase referred to in the preceding paragraph would be within the range previously quoted to Plaintiff.

16. On or about April 22, 2019, Plaintiff again requested a pre-renewal meeting with Defendant.

17. Throughout the months of March and April, 2019, Plaintiff expressed to Defendant that Plaintiff was concerned about the impending date of expiration of its insurance coverage as well as Defendant's failure to provide it with binding renewal quotes.

18. Throughout the latter part of April and the first part of May, 2019, Plaintiff continuously expressed concerns to Defendant that a pre-renewal meeting was necessary and that Defendant was not being responsive to Plaintiff's requests for same.

19. Finally, on or about May 6, 2019, a pre-renewal meeting was scheduled for May 13, 2019, despite Plaintiff's request that the meeting occur several days earlier, i.e., on May 7, 2019.

20. In the emails scheduling this meeting, Defendant again confirmed that the Plaintiff's insurance coverage premium would increase only 5-8%.

21. A few days later, on or about May 10, 2019, Defendant informed Plaintiff that one of its carriers had rescinded its offer of coverage, but that it was actively looking for a replacement policy.

22. When prompted for proposals, Defendant claimed that it was waiting on a proposal from Nationwide Insurance, but that said proposal would require Plaintiff to sacrifice coverages, a claim which Plaintiff later found out to be untrue.

23. Indeed, on information and belief, Defendant did not even request that Nationwide Insurance prepare a proposal.

24. Knowing that its insurance would lapse in about ten days, Plaintiff requested that Defendant submit proposals to Plaintiff by May 22, 2019.

25. Yet, on May 22, 2019, Defendant complained it needed information from Plaintiff to complete the renewal process, despite having been working on the renewal process since March and knowing that Plaintiff's policies were due to expire in days.

26. Although Plaintiff received its first proposal for renewal on or about May 22, 2019, the proposal was missing pages, had no reference to the properties it was intended to insure, was not consistent with the amount of deductible Plaintiff had told Defendant it needed

27. The May 22, 2019 proposal referred to in the previous paragraph had a premium increase of over 30%, a fact that was shocking to Plaintiff.

28. Defendant, in the latter part of May, 2019, assured Plaintiff that it had "approached every carrier [it] could to find the best options."

29. Defendant never advised nor disclosed to Plaintiff that there were insurance policies in the marketplace that would result in only a 15% premium increase as Plaintiff would subsequently find out when it was forced to hire another insurance agent to redo Defendant's job.

30. Moreover, plaintiff has Discovered the statement of value numbers regarding its properties that were to be insured under the policies had been understated by Defendant to the insurance carriers from whom Defendant solicited proposals.

31. Due to the utter disconnect between the policies Plaintiff had requested and those Defendant provided, on or about May 29, 2019, Plaintiff requested a 30-day extension, which Defendant denied.

32. Due to Defendant's denial of an extension, Plaintiff was forced to accept the proposals for fear that it would be left without insurance as its current insurance was due to expire the next day. Thus, on or about May 30, 2019, Plaintiff informed Defendant that it would accept the renewal proposal for a period of three months.

33. Defendant responded that the carriers would not agree to prorate the insurance for three months.

34. On May 31, 2019, Plaintiff requested, yet again, the missing information from the proposals. Its insurance was due to expire that day causing Plaintiff to bind coverage that day even though it still had not received the entire policy.

***Defendant misrepresents the minimum earned premium, revealing the actual minimum earned premium only after it bound Plaintiff.***

35. During the pre-renewal process, Defendant had assured Plaintiff that the minimum earned premium on all the polices it presented was 25%. Indeed, Plaintiff specifically directed Defendant to prepare invoices "based on the earned minimum premium concept of 3 months."

36. It was not until after Plaintiff was bound that Defendant first indicated that the minimum earned premium was 35%. Yet, even then, upon being questioned by Plaintiff, Defendant reversed course, reassuring Plaintiff that the minimum earned premium was 25%.

37. Such information was vital to Plaintiff because it had been forced to bind the insurance as a stop-gap measure to give it more time to find carriers with more reasonable premiums, and had therefore intended to cancel its policies as soon as it could find replacements.

38. In fact, based on the huge increase of the premium, which Defendant had falsely assured Plaintiff multiple times would only be 5-8%, Plaintiff had informed Defendant that it was cancelling its policies, effective August 31, 2019 (25% of the policy period).

39. On or about July 18, 2019, after Defendant had effectively bound Plaintiff and yet before Plaintiff had even been sent the policies, Defendant backtracked, informing Plaintiff that "some of the polices are 25% [minimum earned premium] and some are 35% just depends on the policy. That being said, you will not be able to cancel them all at the same time which is why I mentioned the minimum earned is 35%."

40. Obviously shocked by this new revelation, Plaintiff voiced its concerns to Defendant, reminding Defendant of "the fiduciary responsibilities" that Defendant owed Plaintiff.

***Defendant's actions cause Plaintiff's insurance to lapse, opening Plaintiff up to potential liability for which it should have been insured.***

41. Defendant was adamant that Plaintiff could not prorate the polices for a three-month period. Instead, Defendant told Plaintiff that it had to pay the premium in full and had to wait 45-60 days after September 1, 2019 for a refund.

42. Thus, on or about August 1, 2019, Plaintiff was forced to pay over $500,000 to Defendant to avoid the early cancellation of its policies, which would have left Plaintiff uninsured. Plaintiff informed Defendant of the aforementioned payment that same day, indicating that the payment was made under protest and that Plaintiff disagreed with the amount allegedly owed, but had no other option than to pay if it was to maintain insurance on its properties. In fact, Plaintiff had already received a notice of cancellation from one of Defendant's carriers on or about July 26, 2019.

43. Later that same day, August 1, 2019, Defendant confirmed that it had received Plaintiff's payment of the premium, confirmed it had informed the carriers that Plaintiff's payment had been made, confirmed that the cancellation notices had been rescinded, and

confirmed that coverage was still in effect. To Plaintiff's horror, it was to subsequently learn that such was not the case.

44. On or about August 8, 2019, Plaintiff received cancellation notices from Ace American and GuideOne, two of Defendant's carriers, stating insurance coverage would be cancelled effective August 15 and August 30, respectively, for non-payment of premium and non-compliance with underwriting requirements notwithstanding Plaintiff's payment, under protest, of over $500,000.00 on August 1, 2019.

45. Despite immediately notifying Defendant of said notices on August 8, 2019, no response was proffered until Plaintiff once again demanded an explanation on August 12, 2019, just three days before one of the insurance policies was to lapse, thereby leaving Plaintiff vulnerable to thousands of dollars of potential liability and no insurance coverage.

46. Defendant's only response was that it was "working with carriers now to have premium payment made." Yet, as mentioned in Paragraph 34, above, Defendant had previously indicated to Plaintiff that it had already informed the carriers that payment had been made!

47. Not surprisingly, as its insurance was about to lapse in two days despite its payment of over $500,000 to Defendant, Plaintiff demanded a telephone conference that day, expressing its concerns to Defendant's Ohio Area President, Scott McAdams.

48. On August 26, 2019, Defendant informed Plaintiff that – despite Plaintiff's payment of over $500,000.00 and Defendant's previous assurances that Plaintiff's insurance policies had remained in effect – the polices had been cancelled and needed to be reinstated.

49. Due to the cancellation, the carriers required Plaintiff to sign a No Known Loss letter to reinstate coverage, indicating that "Without this letter T&R assets are in jeopardy should a loss occur."

50. Defendant left Plaintiff scrambling to ensure that its property was covered, causing Plaintiff to sign with another insurance company.

51. Even more stunning is Defendant's explanation that the policies had been canceled because the carriers did not receive payment from Defendant until August 20, 2019 and August 23, 2019, *twenty (and twenty-three) days* after Plaintiff wired Defendant payment for such policies and Defendant confirmed that it had informed the carriers of the payment.

52. On or about August 29, 2019, Plaintiff informed Defendant that it was cancelling the majority of its insurance policies held by Defendant, effective that same day.

***Defendant fails to provide Plaintiff with its insurance policies, binders, certificates of insurance, invoices, and a refund for overpayment of the premium.***

53. The events recounted above were made all the more frustrating due to Defendant's abject failure to provide Plaintiff with any of the documents or paperwork that it needed to make informed decisions about its insurance.

54. Plaintiff requested a total premium summary by carrier for each coverage in the renewal on or about May 31, 2019, yet it never received same.

55. On or about June 10, 2019, Plaintiff requested its certificates of insurance and its insurance binders. Defendant informed Plaintiff that it could not issue either, as it did not have all of the policy numbers.

56. On or about June 11 and on June 12, 2019, Plaintiff once again requested its certificates of insurance and insurance binders. Defendant stated they "were in progress."

57. On or about June 13, 2019, Plaintiff requested invoices, but Defendant failed to produce them.

58. It was not until August 27, 2019, that Plaintiff received a single binder for the June 1, 2019 renewal.

59. On or about September 4, 2019, the parties participated in a telephone conference wherein Defendant agreed to provide Plaintiff with copies of the policies it held and a summary of the ones that it did not have and to determine how the refund of the premium overpayment would be processed.

60. That same day, Plaintiff reiterated its request for the policies that covered Plaintiff's property, as well as the refund owed Plaintiff. Defendant failed to respond.

61. On or about September 13, 2019, Plaintiff was forced, yet again, to request the polices held by Defendant, the refund due, and the complete loss runs for the period that Defendant insured Plaintiff's portfolio. Defendant's response was at best evasive.

62. On or about September 16, 2019, Defendant forwarded to Plaintiff Notices of Intent to Cancel from IPFS dated September 3, 2019, despite being explicitly told that the polices were to be cancelled as of August 29, 2019.

63. By September 18, 2019, Plaintiff had only received three of the twelve loss runs it requested.

64. On September 23, 2019, Plaintiff was informed by its new insurer that it could not issue a new policy covering pollution because Defendant's carrier had not cancelled its policy with Plaintiff, despite Plaintiff's direction to Defendant to do so a month earlier.

65. On or about September 24, 2019, Defendant provided only a fraction of the loss runs requested by Plaintiff. Moreover, Defendant failed to provide Plaintiff with the policies it requested, yet again. Indeed, Defendant stated that several of its carriers would not release the policy that covered Plaintiff's property until Plaintiff signed several forms!

66. On November 22, 2019, Plaintiff once again asked Defendant for copies of the polices, but, once again, to no avail.

67. Incredibly, on November 27, 2019, Plaintiff finally received an invoice for June 1, 2019.

68. On or about December 9, 2019, Plaintiff received a check from IPFS Corp. for $54,281.34 with no accompanying documentation.

69. Plaintiff requested information regarding said check, once again reminding Defendant of its fiduciary responsibilities, but Defendant's response was evasive and provided confusing documentation that did not support the amount of the refund that was provided.

70. Pursuant to Plaintiff's calculation, Plaintiff overpaid Defendant over $200,000 and therefore was due a refund for such.

71. On February 27, 2020, Plaintiff received a Notice of Nonrewal of Insurance from one of Defendant's carriers, stating insurance would expire on June 1, 2020. Presumably, Defendant did not cancel the insurance as requested by Plaintiff even though Defendant had claimed it had done so in a September 24, 2019 email.

72. It was not until March 2, 2020, *nine months* after the policies went into effect and *six months* after cancellation of same, that Plaintiff finally received all of its insurance policies.

**COUNT ONE**
**Promissory Estoppel**

73. Plaintiff incorporates all previous paragraphs as if fully rewritten herein.

74. On multiple occasions, Defendant represented to Plaintiff, among other things, that:

(a) the policies it was presenting to Plaintiff did not have a substantial increase in premiums;

(b) the policies it was presenting to Plaintiff had a minimum earned premium of 25%; and

(c) it had requested a quote from Nationwide Insurance, but that the quote would not provide the coverage that Plaintiff wanted.

75. Plaintiff reasonably and foreseeably relied upon these representations, thereby causing it to contract with Defendant for the brokerage of its insurance policies.

76. Defendant knew that Plaintiff would rely on its representations, and, in fact, *wanted* Plaintiff to rely on its representations because Defendant wanted to keep Plaintiff's business.

77. As a result of Plaintiff's reliance on Defendant's representations, Plaintiff has suffered damages in an amount to be proven at trial in excess of $25,000.

**COUNT TWO**
**Breach of Fiduciary Duty**

78. Plaintiff incorporates all previous paragraphs as if fully rewritten herein.

79. Since approximately January 2016, Plaintiff has relied upon and trusted Defendant to provide business insurance advice and expertise and to procure business insurance on Plaintiff's behalf.

80. Defendant had become intimately familiar with Plaintiff's business operations.

81. Plaintiff relied upon Defendant, as its insurance agent, to assess Plaintiff's insurance needs, advise Plaintiff of available coverages, accurately and fully explain to Plaintiff available coverages, and to secure for Plaintiff the best available coverage at the lowest rates possible.

82. Defendant and Plaintiff understood that Plaintiff had placed a special trust and confidence in Defendant such that a fiduciary relationship had been established between Defendant and Plaintiff.

83. Accordingly, Defendant had a fiduciary duty to Plaintiff in advising Plaintiff as to the substantial increase in premiums and as to the correct percentage of the minimum earned premium.

84. Defendant breached its fiduciary duty to Plaintiff by, among other things,

(a) Misrepresenting the substantial increase in premiums;

(b) Failing to invoice Plaintiff even after multiple requests to do so;

(c) Failing to provide insurance binders even after multiple requests for said binders;

(d) Failing to provide copies of insurance policies even after multiple requests for said policies;

(e) Failing to provide an allocation of premiums;

(f) Providing Plaintiff with its certificates of insurance in an extremely belated fashion; and

(g) Misrepresenting the minimum earned premiums on the renewal proposals.

85. Defendant's breach of its fiduciary duty to Plaintiff has caused damage to Plaintiff.

86. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff has suffered damages in an amount to be proven at trial in excess of $25,000.

## <u>COUNT THREE</u>
## Breach of Contract

87. Plaintiff incorporates all previous paragraphs as if fully rewritten herein.

88. Defendant has materially breached its contract with Plaintiff by,

(a) Misrepresenting the substantial increase in premiums;

(b) Failing to invoice Plaintiff even after multiple requests to do so;

(c) Failing to provide insurance binders even after multiple requests for said binders;

(d) Failing to provide copies of insurance policies even after multiple requests for said policies;

(e) Failing to provide an allocation of premiums;

(f) Providing Plaintiff with its certificates of insurance in an extremely belated fashion; and

(g) Misrepresenting the minimum earned premiums on the renewal proposals.

89. Plaintiff has been damaged as a direct result of Defendant's material breach of the Contract in an amount to be proven at trial in excess of $25,000.

**WHEREFORE**, Plaintiff respectfully requests judgement against Defendant in the following particulars:

(a) On Count One, for judgment in Plaintiff's favor against Defendant for compensatory damages in an amount reasonably expected to exceed $25,000;

(b) On Count Two, for judgment in Plaintiff's favor against Defendant for compensatory damages in an amount reasonably expected to exceed $25,000;

(c) On Count Three, for judgment in Plaintiff's favor against Defendant for compensatory damages in an amount reasonably expected to exceed $25,000;

(d) Legal fees, if legally available;

(e) Costs; and

(f) All other relief, at law or equity, to which Plaintiff may be entitled.

Respectfully submitted,

/s/ Jeffrey M. Lewis, Esq.
JEFFREY M. LEWIS CO., L.P.A.
Jeffrey M. Lewis (0021780)
1650 Lake Shore Drive, Suite 150
Columbus, OH 43204
Telephone: 614-384-2075
Fax: 614-384-2076
Lawyerlewis@gmail.com

/s/ Haley K. Lewis, Esq.
Of Counsel
JEFFREY M. LEWIS CO., L.P.A.
Jeffrey M. Lewis (0021780)
1650 Lake Shore Drive, Suite 150
Columbus, OH 43204
Telephone: 614-384-2075
Fax: 614-384-2076
Haley@lawyerlewis.com
*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by a jury of its peers.

/s/ Jeffrey M. Lewis, Esq.
Jeffrey M. Lewis (0021780)